**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AIRBORNE MEDIA GROUP, INC., | ) | CASE NO.    15-14045 SBB |
| a Delaware Corporation, | ) | CHAPTER:   7 |
| | ) | |
| Alleged Debtor. | ) | |

**MOTION OF PETITIONING CREDITORS, PURSUANT TO BANKRUPTCY RULE 1014(b) FOR AN ORDER STAYING PARALLEL PROCEEDING**

Petitioning Creditors, Andrew Lentvorski, William and Margaret Martinson, Rock Systems Holdings, LLC, and Keith Newbold, through their undersigned counsel, respectfully move for entry of an order, pursuant to Rule 1014(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), staying the later-filed, parallel chapter 11 case commenced by the Alleged Debtor, pending this Court's determination, upon motion by the Petitioning Creditors (or any other party in interest) and pursuant to Bankruptcy Rule 1014(b), regarding the appropriate venue in which any such cases may proceed.  In support of the Motion, the Petitioning Creditors state as follows:

**PRELIMINARY STATEMENT**

1. On the day the Answer to the Involuntary Petition was due in this proceeding, the Alleged Debtor filed a voluntary Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware.  The Delaware bankruptcy filing is obvious forum shopping.  The Debtor is headquartered in Durango, Colorado and is in the process of moving its network operations to Denver. The Alleged Debtor has no connections to Delaware (other than the State of incorporation). According to the Alleged Debtor's list of 20 largest unsecured creditors, 9 of the creditors (representing 45% of the claims) are located in Colorado. Ninety-five percent of the creditors, representing 98.3% of the claimed amount, is located west of the Mississippi River. There is not a single Delaware creditor.   Indeed, only one Indiana creditor, representing 1.7% of the value of the claims is located east of the Mississippi.  Of the Alleged Debtor's 101 shareholders, 73 shareholders (representing approximately 72.3% of the total number of shareholders) are located in Colorado. None of the Alleged Debtor's shareholders are located in Delaware. Moreover, the Alleged Debtor, which is run by a two time felon, has a history of misusing the judicial process for the purposes of delay.

2. This type of blatant forum shopping only recently became possible due to a slight change to Bankruptcy Rule 1014(b).  Prior to December of 2014, the second filed Delaware bankruptcy proceeding would have been automatically stayed pending further order of this Court. Under the current version of Bankruptcy Rule 1014(b), the stay is not automatic.  However, this Court, as the court with the first filed pleading, has discretion to stay the Delaware proceeding while this Court determines which proceeding should go forward.

3. Under both the pre and post amendment versions of Bankruptcy Rule 1014(b), this Court, as the court in which the case involving the Alleged Debtor was first filed, has sole authority to determine the venue in which cases should proceed. Bankruptcy Rule 1014(b) provides that this determination must be made "in the interest of justice or for the convenience of the parties." Bankruptcy Rule 1014(b). The Petitioning Creditors believe that it is "in the interest of justice or for the convenience of the parties" for the Alleged Debtor's case to remain in this Court.

4. Well-established practical and legal principles demonstrate that two bankruptcy cases involving the same debtor and the same debts should not proceed simultaneously. This rule, first announced by the United States Supreme Court in *Freshman v. Atkins*, 269 U.S. 121 (1925), is based upon the fundamental bankruptcy principle that two estates consisting of the same property cannot coexist.   Bankruptcy Rule 1014(b) specifically authorizes this Court to stay the Delaware proceeding pending a determination of the appropriate venue.  Absent a stay of the parallel case involving the Debtor, substantive and administrative confusion is certain to arise, with the estates, creditors and both courts incurring unnecessary expenses arising therefrom.

5. Accordingly, to promote the efficient administration of the Alleged Debtor's case and prevent unnecessary confusion and expense, the Court should stay the Delaware proceeding pending resolution of the venue issues by this Court under Bankruptcy Rule 1014(b).

## FACTS

*Introduction*

6. The Petitioning Creditors were some of the initial investors in a company known as Airborne Media Group, Inc., a Nevada corporation ("AMG-Nevada").  AMG-Nevada is the predecessor of the Alleged Debtor, Airborne Media Group, Inc., a Delaware corporation, (the "Alleged Debtor" or "AMG").

7. During 2012, Cordell Brown, the then President of AMG-Nevada, concocted a "reorganization" of AMG-Nevada which would greatly diminish interests of the Petitioning Creditors.  Litigation ensued in the Nevada State Court.  During the course of the litigation it was discovered that Mr. Brown was a two time felon.  Mr. Brown plead guilty to securities fraud in 1988 and forgery and other related crimes in 2010.  Documentation of Mr. Brown's latest criminal history in Utah is attached as **Exhibit A.**  Mr. Brown's prior securities fraud conviction is described in his deposition attached as **Exhibit B**, page 20, lines 4-10.

8. In connection with the "reorganization", the Alleged Debtor commenced an action against the Petitioning Creditors.  After two years of obfuscation and delay, the Nevada State Court sanctioned the Alleged Debtor and specifically made a finding of bad faith with respect to certain actions of the Alleged Debtor.  The Nevada State Court entered judgments in favor the Petitioning Creditors (the Respondents/Defendants) and against the Alleged Debtor who was the Petitioner/Plaintiff.  The Alleged Debtor has appealed the judgments, but has not obtained a stay of enforcement of the judgments.

2

9. The Petitioning Creditors are currently creditors of the Alleged Debtor having obtained un-stayed judgments in the collective amount of $1,908,596.87 against the Alleged Debtor. Copies of the Judgments are attached as **Exhibit C.**[1] After unsuccessfully attempting to collect their judgements under state law, Petitioning Creditors filed their Involuntary Petition against the Alleged Debtor on April 17, 2015.[2]

*Formation of AMG-Nevada*

10. AMG-Nevada was launched in March of 2011, as a technology company with a new product that would "unmute your world." The technology allows users the ability to tap into a muted television at their favorite sports bar, restaurant, or any location offering muted television content, and privately listen to the televised programming by way of streaming the digital audio through the users' wireless device, like an iPhone or tablet. The technology also offers advertising opportunities to the users through a downloadable application on their mobile device and provides data gathering opportunities to the establishments.

11. The original principals in AMG-Nevada were Ryan Danford and Justin Ginn who were later joined by Daries "Chip" Lile and Cordell Ronald Brown (collectively, the "Founders"). The Founders have at all times managed the operations of the company, and each was a charter member of AMG-Nevada's board of directors.

12. Following the formation of AMG-Nevada, the founders sought to raise money to capitalize the company and protect the company's intellectual property by filing patent applications. During 2011 and 2012 AMG-Nevada conducted private offerings of stock and convertible debt offerings. By June 2012, just a little over one year after opening their doors, AMG-Nevada had issued a significant number of shares raising close to $2,000,000, and the company was planning a second round of funding.

13. In mid-2012, the Founders proposed to reorganize the company wherein AMG-Nevada would merge into the Alleged Debtor, with the AMG-Nevada shareholders, including Petitioning Creditors, receiving convertible preferred stock in the Alleged Debtor in exchange for their common stock in AMG-Nevada. The stated purpose for the merger was to enable the company to better attract large institutional investors and technology venture capitalists.

---

1. The judgments held by the Petitioning Creditors also include interest. In addition, the Petitioning Creditors hold separate judgments of approximately $35,000.00 entered against the Alleged Debtor as a discovery sanction.

2. As discussed more fully below, the timing of the involuntary petition was driven, in large part, by the timing of a preferential transfer made by the Alleged Debtor to its counsel. The involuntary petition was filed within 90 days of the transfer so as to preserve a cause of action under Section 547 of the Code.

14.     Petitioning Creditors immediately questioned the structure and terms of the proposed merger as it was originally described to them and voiced those concerns with the Founders and the other shareholders. The proposal was troubling for multiple reasons.

> a. The merger would result in a severe reduction in the original investors' percentage of ownership of the company. The reorganization would reallocate a large percentage of ownership to the Founders, with no corresponding contribution on their part. Specifically, the existing shareholders would go from owning 81.6 percent of the authorized common stock, to owning 24.5 percent of the authorized shares and being permanently relegated to minority status.
>
> b. Cordell Brown began suggesting that the intellectual property was not owned by AMG-Nevada. This was completely contrary to the representations made to the original investors that the company would own the intellectual property.[3]
>
> c. The Founders' lack of transparency in dealing with shareholder requests for information caused the Petitioning Creditors to believe the Founders were mismanaging AMG-Nevada. For example, in direct conflict with the original company bylaws, the Founders deliberately avoided conducting the annual shareholder meeting. Also, the Founders ignored Petitioning Creditors' repeated requests for copies of the company's financial documents, including historical financial statements and an accounting of the investment funds. The Founders deliberately kept the shareholders in the dark as to how the Founders spent more than $2 million that had been invested in AMG-Nevada.

15.     Petitioning Creditors continued to believe in the potential of the technology developed by AMG-Nevada. However, as a result of the unfair merger engineered by the Founders, the Petitioning Creditors had little choice but to relinquish their ownership of AMG-Nevada and exercise their rights as dissenting shareholders under Nevada law.

---

3. The Founders had in fact assigned ownership of the IP into AMG-Nevada in May 2012. Then, they assigned it a second time to the Alleged Debtor in August 2012 with the stated purpose of "resetting equity" and "avoiding IRS consequences." Considering they were giving themselves nearly $2.65 million "stated" value at the expense of the original investors, the Founders clearly breached their fiduciary responsibility as board members.

4

*The Nevada State Court Proceeding*.

16. On February 19, 2013, each of the Petitioning Creditors, through common counsel, timely exercised their dissenting shareholders' rights by notifying the Alleged Debtor of their dissent, demanding payment for their shares. Petitioning Creditors also tendered their stock certificates to AMG-DE as required by applicable law. On March 19, 2013, the Alleged Debtor tendered a check to each Petitioning Creditor in an amount equal to five cents times the number of AMG-Nevada shares held, plus interest (a value 1/20th of the $1.00 per share for which they were purchased). The Petitioning Creditors, based on expert valuation, demanded $4.25 per share for their stock in AMG-Nevada.

17. Having exercised their dissenters' rights, Petitioning Creditors forfeited their rights as shareholders of AMG-Nevada. On June 12, 2013, the Alleged Debtor commenced an action in Nevada against the Petitioning Creditors to determine the fair value of their interests (the "Nevada State Court Proceeding"). A copy of the Alleged Debtor's Petition for Determination of Fair Market Value of Stock Pursuant to N.R.S. 92A.490(1) (without attachments) is attached as **Exhibit** D.

18. During the course of the Nevada State Court Action, it was discovered that Cordell Ronald Brown, the CEO of the Alleged Debtor, was a twice convicted felon. During 1988 Mr. Brown had been convicted of securities fraud. Then in 2009, Mr. Brown, aka Neal Rochel and John Smith, was further convicted of the felon of Forgery and several lesser crimes including Attempted Possession of Forgery Writing Device, Theft by Deception and Interfering with Legal Arrest. Mr. Brown's criminal history had not been disclosed to the Petitioning Creditors at the time they acquired their stock in AMG-Nevada.

19. While the Alleged Debtor had commenced the Nevada State Court Action for the next two years the Alleged Debtor engaged in a calculated pattern of conduct designed to frustrate and delay the proceeding. Indeed, Cordell R. Brown admitted that the strategy was to buy time to avoid having to immediately compensate the Petitioning Creditors. **Exhibit B;** Deposition of Cordell Brown, page 126 lines 1-10.

20. On July 17, 2014, following lengthy briefing and multiple hearings, the Nevada Court conditionally granted Respondents' Motion for Discovery Sanctions. The Court found that the Alleged Debtor willfully and without cause failed to comply with the Court's orders and other discovery obligations. Such conduct supporting the sanctions including:

    a. The Alleged Debtor's failure, without cause, to appear for a mandatory April 9, 2014, status conference,

    b. The Alleged Debtor's apparent failure to timely serve its expert valuation report,

    c. The Alleged Debtor's failure to timely turnover requested documents to the Petitioning Creditors,

      d. The Alleged Debtor's failure to appear at its duly noticed depositions on May 5, 2014, and

      e. The Alleged Debtor's failure to comply with the Court imposed deadline to file its supplemental response to the Sanctions Motion.

21. The Nevada Court gave the Alleged Debtor an opportunity to correct these problems and pay approximately $35,000.00 to the Petitioning Creditors as a sanction for their conduct. The Alleged Debtor failed to do so and as a result, the Nevada Court on November 20, 2014 entered an Order Reinstating Terminating Sanction and Striking Petition for Determination of Fair Value of Stock Pursuant to N.R.S. 92A.490(1) (the 'Final Sanctions Order"). A copy of the Final Sanctions Order is attached as **Exhibit E.**

22. While it was the Alleged Debtor which had commenced the Nevada State Court Proceedings, the Nevada Court concluded that on the merits of matter, the Alleged Debtor had acted arbitrarily and in bad faith by failing to comply with the statutory obligations to offer the Petitioning Creditors the fair value of their interests in AMG-Nevada. *See*: **Exhibit F** at page 3.

23. Specifically, the Nevada State Court concluded that Alleged Debtor's offer of $.05 per share was without legitimate basis and the Court adopted the Petitioning Creditors' valuation of $4.25 per share and subsequently awarded them the right to recover their legal fees and costs associated with the judgment as well as those incurred to collect the judgment. See: **Exhibit F** at pages 2-3.

24. On January 22, 2015, the Nevada State Court entered judgment in the collective amount of $1,908,596.87 against the Alleged Debtor and in favor of the Petitioning Creditors. Following entry of the judgments, the Petitioning Creditors sought and were granted permission to conduct a judgment debtor examination under Nevada law. Cordell Brown appeared for the examination; however, Mr. Brown failed to produce the majority of the financial documents which were required under the Nevada State Court Order authorizing the examination.

25. During the collection process, it was discovered that on January 20, 2015, the Royse Law Firm, with the consent of the Alleged Debtor, filed a financing statement against Alleged Debtor's intellectual property. The Royse Law Firm drafted the reverse merger documents that led to the Petitioning Creditors dissenting from the transaction, and by surrendering their stock, entitled them to be paid fair value for their shares. The Royse Law Firm represented, and by filing an appeal continues to represent, the Alleged Debtor.

26. If perfected, that UCC filing would give Royse unfair preference over most of the Alleged Debtor's creditors, not just the Petitioning Creditors   Due, in part, to the fact that the Alleged Debtor was granting preferential treatment to its counsel, the Petitioning Creditors filed the involuntary petition against the Alleged Debtor within 90 days of the date the financing statement was filed.

## ARGUMENT

27. Where two bankruptcy cases are filed by or against the same debtor in different courts, the court in which the first case was filed (in this preceding the Colorado Court) determines which forum is appropriate, with reference to two factors: (a) "the interest of justice" and (b) "the convenience of the parties." *Id*. Bankruptcy Rule 1014(b), titled "Procedure When Petitions Involving the Same Debtor or Related Debtors are Filed in Different Courts," provides as follows:

> If petitions commencing cases under the Code … are filed in different districts by, regarding, or against … the same debtor …, the court in the district in which the first-filed petition is pending may determine, in the interest of justice or for the convenience of the parties, the district or districts in which any of the cases should proceed. The court may so determine on motion and after a hearing …. ***The court may order the parties to the later-filed cases not to proceed further until it makes the determination***.

Fed R. Bankr. P. 1014(b) (emphasis added).

28. This Court should issue an order staying the later-filed, parallel chapter 11 case involving the Debtor, pending this Court's determination regarding venue, because allowing two Bankruptcy cases involving the same debtor and the same debts to proceed simultaneously is both practically untenable and contrary to applicable law. Pursuant to Bankruptcy Rule 1014(b), this Court has discretion to issue an order staying any parallel case subsequently filed in another bankruptcy court until this Court issues a ruling regarding venue. *See* Fed. R. Bankr. P. 1014(b). The final sentence of Bankruptcy Rule 1014(b) specifically provides that the court in which the first-filed bankruptcy case is pending "may order the parties to the later-filed cases not to proceed further until it makes the determination" regarding venue. Fed. R. Bankr. P. 1014(b).[4]

29. In addition, allowing chapter 11 cases to proceed in parallel is procedurally untenable and contrary to well-established bankruptcy principles. The United States Supreme Court's ruling *in Freshman v. Atkins*, 269 U.S. 121 (1925), held that two bankruptcy cases involving the same debtor and the same debts cannot proceed simultaneously. Most courts applying *Atkins* and its progeny have interpreted the holding of *Atkins* to mean that "maintaining simultaneous bankruptcy cases is per se barred." *In re Brown*, 399 B.R. 162, 166 (Bankr. W.D. Va. 2009) (citations omitted) (further stating that "[i]n general, the majority cites … *Atkins* for the proposition that a debtor may never maintain simultaneous cases under the Bankruptcy Code"); *In*

---

4. This formulation of Bankruptcy Rule 1014(b) became effective on December 1, 2014. The relevant portion of the prior rule provided as follows:

> Except as otherwise ordered by the court in the district in which the petition filed first is pending, the proceedings on the other petitions shall be stayed by the courts in which they have been filed until the determination is made.

*re Caperoads Plaza L.P.*, 154 B.R. 614, 615 (Bankr. D. Mass. 1993) ("[E]ver since *Freshman v. Atkins* …, it has generally been held that simultaneous cases are prohibited.").

30. The Supreme Court's decision in *Atkins* is complemented by the "single estate rule," recognized by numerous courts, which provides that two bankruptcy cases concerning the same debtor and the same debts cannot proceed simultaneously because multiple estates consisting of the same property cannot coexist.[5] *See In re Parson*, No. 01-73786, 2007 WL 3306678, at 12 (Bankr. E.D. Va. Nov. 6, 2007) ("[T]he 'single estate rule' … holds that a debtor cannot maintain simultaneous bankruptcy cases because [a] debtor possesses only one estate for purposes of trusteeship.") (citations and quotation marks omitted*); Turner v. Citizens Nat'l Bank of Hammond (In re Turner)*, 207 B.R. 373, 378 (B.A.P. 2d Cir. 1997) ("the filing of simultaneous petitions is contrary to the obvious contemplated function of the Bankruptcy Code to resolve a debtor's financial affairs by administration of a debtor's property as a single estate under a single chapter within the code") (citations and quotation marks omitted); *Brown*, 399 B.R. at 168 ("[P]roperty cannot be an asset[ ] of both estates simultaneously.") (*quoting Bateman v. Grover (In re Berg)*, 45 B.R. 899, 903 (B.A.P. 9th Cir. 1984)).

31. The issuance of an order staying the parallel chapter 11 case filed by the Alleged Debtor pending determination of the venue issue also is appropriate for pragmatic reasons. Allowing both cases to proceed in the interim would cause confusion and subject the Debtor, creditors and both affected Courts to unnecessary costs arising from the duplication of efforts. *See Frank v. Mannucci (In re Mannucci)*, No. 1:12-BK-07138, 2013 WL 3294093, at 3 (Bankr. M.D. Pa. June 28, 2013) ("[E]ven courts that reject a per se bar to maintaining simultaneous cases permit the second case to go forward only when it does not interfere with the administration of the first case.… 'The problems that simultaneous cases raise include confusion among creditors as to the necessity and procedure for filing of claims, difficulties in determining in which estate assets belong, and the entitlement of the … trustee and other professionals to fees and commissions.'") (*quoting In re Hodruski*, 156 B.R. 353, 356 (Bankr. D. Mass. 1993)). Thus, in light of (a) well-settled bankruptcy principles prohibiting the simultaneous prosecution of multiple cases concerning the same debtor and the same debts and (b) the unnecessary costs and complications that the simultaneous pendency of multiple parallel chapter 11 cases involving the Debtor would create, the Court should exercise its discretion under section 105(a) of the Bankruptcy Code and

---

5. As in voluntary bankruptcy cases, an estate is created upon the filing of an involuntary bankruptcy petition. *See* 11 U.S.C. § 541(a) ("The commencement of a case under section 301, 302, or 303 [dealing with involuntary cases] of this title creates an estate.") (*emphasis added*); *In re Sweports, Ltd.*, 476 B.R. 540, 545 (Bankr. N.D. Ill. 2012) ("[T]he filing of an involuntary case also creates a bankruptcy estate, just as the filing of a voluntary case does[.]") (*citing* 11 U.S.C. § 541(a)); *In re E. D. Wilkins Grain Co.*, 235 B.R. 647, 649 (Bankr. E.D. Cal. 1999) ("While no order for relief is entered upon the filing of an involuntary petition, its filing creates an estate consisting of all of the involuntary debtor's property.") (*citing* 11 U.S.C. §§ 303(h), 541(a)).

Bankruptcy Rule 1014(b), and stay any such later-filed parallel chapter 11 cases pending the Court's determination regarding venue.

32. The Alleged Debtor will suffer no prejudice from the requested stay and the interests of justice will be served by the entry of the stay. The Delaware proceeding should be stayed until this Court makes the required determination under Bankruptcy Rule 1014(b) for the following reasons:

*There Has Been No Substantive Action In The Delaware Proceeding.*

33. As of May 10, 2015 at 3 p.m., the Alleged Debtor has not filed any substantive pleadings in the Delaware Bankruptcy Court. A copy of the Docket Sheet from the Delaware Bankruptcy Court is attached as **Exhibit** G.

*Colorado Is Required To Be The Focus Of This Proceeding*

34. Under Bankruptcy Rule 1014(b), the Court in Colorado will make the determination as to which any of the cases should proceed. Consequently, at least for the short term, the focus of all activity will be in the United States Bankruptcy Court for the District of Colorado. This will be true regardless of whether or not the stay is granted. Given the prior criminal history of the CEO of the Alleged Debtor, the Petitioning Creditors have contemplated filing a motion for appointment of a trustee once this matter is at issue.

*The Debtor Can Proceed With Its Reorganization in Colorado*

35. To the extent the Alleged Debtor has a legitimate desire to reorganize, it need only convert this proceeding to a Chapter 11 proceeding. under Section 706, the Alleged Debtor has the absolute right to convert to Chapter 11 and has already conditionally requested such a conversion. *See: Motion Of The Debtor To (I) Dismiss The Chapter 7 Case And Award The Debtor Its Attorneys' Fees, Costs, And Damages Or (Ii) Convert To A Voluntary Chapter 11 Case And Transfer Venue Of The Case To The United States Bankruptcy Court For The District Of Delaware (the "Motion to Dismiss"*; Docket Number 7 at page 12). Similarly, to the extent the Alleged Debtor believes that this proceeding is more appropriately handled in Delaware, it is free to file a motion for change of venue. Again, the Alleged Debtor has conditionally sought a change of venue in this proceeding. *See Motion to Dismiss* at page 15.

36. For reasons which are yet to be explained, the Alleged Debtor did not simply convert this proceeding to a Chapter 11 proceeding and move for a change of venue.[6] Instead, the

---

6. In his affidavit, the CEO of the Alleged Debtor argues that it is more convenient for him to travel from Durango, Colorado to Wilmington, Delaware, as opposed to Denver, Colorado. The veracity of Mr. Brown is highly suspect given his prior criminal history. A "Travelocity" search for tickets between Durango/Denver and Albuquerque/Wilmington, DE indicates that

9

Alleged Debtor has sought to dismiss this proceeding. It appears that the only beneficiary of dismissal would be the Alleged Debtor's lawyers (The Royse Law Firm) who currently hold a security interest which was perfected within 90 days of the filing of this proceeding.

*There Is A Strong Likelihood That the Colorado Proceeding Will Be the Appropriate Forum*

37. Bankruptcy Rule 1014(b) provides that the venue as to which bankruptcy proceeding should continue must be made "in the interest of justice or for the convenience of the parties." Fed. R. Bankr. P. 1014(b). The Petitioning Creditors believe that it is "in the interest of justice or for the convenience of the parties" for the Alleged Debtor's case to remain in this Court.

38. The Alleged Debtor is a Colorado company with its principal office in Durango Colorado and an operational facility in Denver. All of the Alleged Debtor's employees appear to be in Colorado.

39. Virtually all of the potential witnesses in this matter live in Colorado or the surrounding States.

40. The Alleged Debtor's bald allegation that the parties in interest in this proceeding are scattered all over the country cannot withstand even mild scrutiny. Colorado is unquestionably the center of activity. A summary of the geographical distribution of the various parties is a follows:

> a. **Distribution of Unsecured Creditors.** According to the Alleged Debtor's list of 20 largest unsecured creditors, nine of the creditors (representing 45% of the claims) are located in Colorado.[7] Fifty-five percent of the creditors, representing 70.1% of the claim amounts, live in Colorado or the surrounding States. Ninety-five percent of the creditors, representing 98.3% of the claimed amount, is located west of the Mississippi River. There is not a single Delaware creditor. Indeed, only one Indiana creditor, representing 1.7% of the value of the claims, is located east of the Mississippi.

---

roundtrip airfare from Durango to Denver, with a booking more than three weeks out, typically runs approximately $340 and takes an hour and seven minutes. Roundtrip from Albuquerque to Wilmington, DE, with a booking of more than three weeks out, typically runs $628 and the shortest flight time is nine and a half hours each way. That has to be added to the 3.5 hours travel time each way to and from Albuquerque and the motels that will likely be required.

7. It appears that at least two of the creditors listed on the Alleged Debtor's List of 20 Largest Unsecured Creditors are actually secured creditors.

b. **Distribution of Shareholders by Percentage of Shareholders:** If you add the four Founder shareholders to the 97 shareholders that the Alleged Debtor lists in the petition, there are 101 shareholders[8]. Seventy-three of those shareholders, or 72.3%, reside in Colorado. Another 9 of the shareholders, amounting to an additional 8.9%, have addresses in states immediately adjacent to Colorado. *That means that a total of 81.2% of the shareholders live in Colorado or immediately adjacent states*. Among the remaining shareholders, another 7 have Texas addresses, 5 have California addresses, one has a Nevada address and one has a Montana address. *As a result, of the 101 total shareholders, only 4 (4%) are located east of the Mississippi River.*

c. **Distribution of Shareholders by Percentage of Shares:** Breaking down the numbers by the percentage of shares issued and outstanding results in an even more compelling case. The total number of shares issued to non-Founder shareholders, according to Alleged Debtor's schedules, is 2,368,700.[9] Only 15.8% of the total shares issued belong to owners with addresses outside Colorado. That leaves a total of 84.2 percent of the shares of stock belonging to owners that reside in Colorado. *If you include the stock ownership for the shareholders in immediately adjacent states (approximately 5.4%), a total of approximately 89.6% live in Colorado or immediately adjacent states*. Less than 4.5% of the shares of stock belong to owners that reside east of the Mississippi River.

d. **Distribution of Holders of Convertible Notes**. 98.1% of the owners and of the value of the Convertible Notes of the Debtor are west of the Mississippi and 84.5% of the value is in Colorado. Seventy-seven percent the owners are in Colorado.

41. The primary reason advanced by the Alleged Debtor for its selection of Delaware appears to be the fact that the Polsinelli law firm has an office in Delaware. This is of little or no

---

8. Pursuant to the Reorganization, the Founders were issued 2.65 million shares of stock. It is important to note that the shareholder list included in the petition filed by AMG does not include the shares issued to the Founders. The stock of the Founders appears to be omitted from the Statements filed by the Alleged Debtor in the Delaware bankruptcy proceeding. Using the Alleged Debtor's numbers and addresses, only 15.63% of the total shares issued belong to owners with addresses outside Colorado. That leaves a total of 84.64 percent of the shares of stock belonging to owners that reside in Colorado. If you include the stock ownership for the shareholders in immediately adjacent states (9.94%), a total of 94.58% live in Colorado or immediately adjacent states.

9. Note that there is no number of shares listed next to the last entry of listed shareholders, the Zambros. Percentages quoted presume no shares for that listing.

consequence. The Alleged Debtor has very recently selected the Polsinelli law firm to act as bankruptcy counsel in this case. The Polsinelli law firm and particularly its Delaware counsel do not have a history with this matter. Moreover, the Polsinelli law firm is a national firm, which maintains a large Denver office with experienced Colorado bankruptcy counsel. Consequently, there will minimal inconvenience to the Alleged Debtor's counsel if this Delaware proceeding is stayed pending determination by this Court of which proceeding will move forward.

### *The Alleged Debtor Has A History Of Abusing The Judicial System.*

42. This is not the case of an unfortunate, but honest debtor which is need of financial rehabilitation. The Alleged Debtor has a history of abusing the judicial process.

43. The Alleged Debtor previously commenced a "reorganization" in connection with its merger with AMG-Nevada. It is important to remember that it was the Alleged Debtor, and not the Petitioning Creditors, which commenced the Nevada State Court Action. Just as with bankruptcy reorganization, the Alleged Debtor owed fiduciary duties to the various constituencies. However, as determined by the Nevada State Court, the Alleged Debtor simply disregarded its fiduciary duties. The Nevada State Court found:

> Moreover, in light of Mr. testimony, the Court finds that AMG-DE's offer under N.R.S. 92A.460 of five cents per share, which AMG-DE estimated to be the fair value of AMG-NV [the Alleged Debtor] stock at the time of the merger between AMG-NV and AMG-DE, is not realistic. The evidence establishes that AMG-DE did not use customary and current valuation concepts and techniques generally employed when valuing "ad tech" companies in a pre-revenue position. ***Consequently, the Court concludes that AMG-DE acted arbitrarily and in bad faith by failing to comply with its statutory obligation to offer the dissenter's a fair value for their shares***, see N.R.S. 92A.460, and to meaningfully participate in this lawsuit. Therefore, under N.R.S. 92A.500(2) & (5) and N.R.S. 92A.500(1), Respondents are entitled to the reasonable attorneys' fees and costs they incurred in this litigation and in exercising their dissenting shareholder rights.

**Exhibit** F at page 3. *Emphasis supplied*.

44. The Alleged Debtor's statements that it has been in good faith negotiation with the Petitioning Creditors should be entirely discounted. The Alleged Debtor has done everything in its powers to delay the Petitioning Creditors while paying lip services to "good faith negotiations." In connection the prior reorganization the Alleged Debtor admitted that it was primarily a delaying tactic:

> Q.· ·And it goes down at the very bottom of the page, it says, The date you have proposed all look good.· And concerning the dissenter action, we are in negotiation with them currently and are dragging things out until we come up with a final strategy.· What were you talking about there?

> A.·  ·I'm talking about the status of the dissenters' actions, issues.·  We're trying to deal with the dissenters matter.
>
> ·Q.·  ·What was your strategy?
>
> A.·  ·Our strategy was to buy as much time to see if we could come up with money so that we could possibly reach a -- a potential settlement with them.

**Exhibit** B. Deposition of Cordell Brown, page 126 lines 1-10.

45. The Alleged Debtor's veracity is critically important. The Alleged Debtor has raised millions of dollars by selling unregistered securities in the form of stock and convertible notes. Many of these unregistered securities were apparently sold by Cordell Brown while he was on probation from his most recent conviction. Mr. Brown admitted that he failed to make disclosure of his criminal record in connection with his sale of securities in the Alleged Debtor. Not only is the CEO of the Alleged Debtor a convicted felon, he has failed to testify truthfully about his convictions, and about having ever used aliases. See attached Deposition of Cordell Brown; **Exhibit** B, page 20, line 1 through page 28 line 11.

46. The current forum shopping scheme is a continuation of the Alleged Debtor's past practices. The Alleged Debtor offers no defense to the involuntary bankruptcy petition and concedes that the filing of a bankruptcy petition is in its best interest. However, instead of converting this proceeding to Chapter 11, the Alleged Debtor has moved to dismiss this proceeding. Alleged Debtor then seeks to have attorney's fees against the Petitioning Creditors. Keep in mind that judgments held by Petitioning Creditors were entered in an action commenced by the Alleged Debtor. In essence, the Alleged Debtor is attempting to blame the victims for the consequences of its own misconduct. This is not the conduct of an honest debtor which has a sincere desire to reorganize.

47. In addition to service by mail, the undersigned has caused this Motion to be served by email on the counsel for the Alleged Debtor.

48. Based on the forgoing, the Petitioning Creditors request the Court to enter a Stay of the Delaware bankruptcy proceeding pending a determination by this Court of which bankruptcy proceeding will move forward pursuant to Bankruptcy Rule 1014(b).

WHEREFORE, the Petitioning Creditors respectfully request that the Court: (i) enter an order substantially in the form attached hereto as Exhibit H, granting the relief requested herein; and (ii) grant such other and further relief to the Petitioning Creditors as the Court may deem proper.

Dated:   May 10, 2015.

                APPEL, LUCAS & CHRISTENSEN, P.C.

                *s/ Peter J. Lucas*
                Peter J. Lucas, No. 13345
                Shaun Christensen, No. 23131
                Appel, Lucas & Christensen, P.C.
                1660 17th Street, Suite 200
                Denver, Colorado 80202
                (303) 297-9800 telephone
                Lucasp@appellucas.com
                Christensens@appellucas.com
                Attorneys for Petitioning Creditors

CERTIFICATE OF SERVICE

  I certify that on May 10, 2015, the foregoing will be served by U.S. Mail, postage prepaid, to the following:

Airborne Media Group, Inc.
A Delaware Corporation
c/o Cordell Brown, Registered Agent
P.O. Box 3990
Durango, CO   81302

U.S. Trustee
1961 Stout Street
Suite 12-200
Denver, CO   80294

William and Margaret Martinson
3521 S. Darlington
Tulsa, OK   74135

Keith Newbold
21010 Highway 160
Durango, CO ; 81303

POLSINELLI PC
Christopher A. Ward
Shanti M. Katona
Jarrett Vine
222 Delaware Avenue
Suite 1101
Wilmington, Delaware 19801
cward@polsinelli.com
skatona@polsinelli.com
jvine@polsinelli.com

Airborne Media Group, Inc.
A Delaware Corporation
c/o Cordell Brown, Registered Agent
1099 Main Avenue, Suite 321
Durango, CO   81301

Andrew Lentvorski
11976 Stoney Peak Dr., #916
San Diego, CA   92128

Rock Systems Holdings, LLC
c/o David Sanderlin
Managing Member
5576 County Road 250
Durango, CO   81301

Caroline C. Fuller, Esq.
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, CO   80202

POLSINELLI PC
Cristel Shepher
1515 Wynkoop Street
Suite 600
Denver, Colorado 80202
cshepard@polsinelli.com

  Date:   May 11, 2015

/s/ *Candy J. Jones*
Candy J. Jones

15